UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

**GLENN M LEMONIA**                        CASE NO. 2:20-CV-01593

**VERSUS**                                 JUDGE JAMES D. CAIN, JR.

**WESTLAKE  MANAGEMENT  SERVICES  MAGISTRATE JUDGE KAY
INC**

## MEMORANDUM RULING

Before the court is a Motion for Summary Judgment [doc. 17] filed by defendant

Westlake Management Services, Inc. ("Westlake") in response to the employment

discrimination suit brought under the Age Discrimination in Employment Act, Title VII of

the Civil Rights Act, and 42 U.S.C. § 1981 by plaintiff Glenn Lemonia. Plaintiff opposes

the motion. Doc. 29.

## I.
### BACKGROUND

This suit arises from plaintiff's employment at Westlake, a chemical plant located

in Calcasieu Parish, Louisiana. Doc. 1. Plaintiff, an African-American man, began his

employment as an electrician in 1989 at the facility known as "Westlake South," under the

management of Westlake's predecessor PPG. *Id.* at ¶ 11. Plaintiff's employment was

subject to a collective bargaining agreement ("CBA") and plaintiff was a member of the

union-represented bargaining unit. Doc. 17, att. 3, ¶¶ 3 & 4. Westlake acquired the

Westlake South site in 2016, and plaintiff continued working there. *Id.* at ¶¶ 4–5.

In March 2017, electrical maintenance superintendent Leon Campbell moved plaintiff and other electricians to Plant B. Doc. 17, att. 4, ¶¶ 2–3. The union grieved the move, alleging that only African-American electricians were moved. *Id.* After an investigation, the company determined that Caucasian employees were also moved and denied the grievance. *Id.* Plaintiff then filed a charge of discrimination with the EEOC, which dismissed the charge and issued a notice of suit rights on May 25, 2017. Doc. 17, att. 1, pp. 96–97. Plaintiff did not file a suit after this dismissal. *Id.* at 78–79.

In 2018, Westlake instrumentation, electrical, and controls manager Bryan Thompson initiated a site reorganization with the assistance of electrical maintenance superintendent Leon Campbell that resulted in the addition of three new electrical maintenance supervisor positions. Doc. 29, att. 3, pp. 15, 18; 22–26. All three supervisor positions reported directly to Campbell, who in turn reported to Thompson. *Id.* at 18–19; doc. 29, att. 4, p. 28. Both Thompson and Campbell are white. Doc. 17, att. 2, ¶ 1; doc. 29, att. 2, p. 54.

Plaintiff applied for the position and emailed Campbell in August 2018 to express his interest. Doc. 17, att. 1, pp. 84, 98. In September, before interviews, plaintiff complained to Campbell about new chairs in the Plant B breakroom. Doc. 17, att. 2, ¶ 3. He then renewed his complaint about the chairs to Thompson, and further complained to Thompson that Campbell had screamed and cursed at him when he raised the issue. *Id.* Thompson told plaintiff he would look into the situation and that he could always bring discrimination or safety-related concerns to him, but suggested that he try to resolve more minor issues directly with his supervisor. *Id.* To illustrate his point, he recalled an incident

where plaintiff had complained about not receiving an appreciation meal after a successful turnaround. *Id.* Thompson then met with Campbell, who denied cursing or yelling at plaintiff but said he was open to talking with plaintiff about his concerns. *Id.* at ¶ 4. Thompson met with plaintiff again and reported Campbell's response. *Id.* at ¶ 5. He also offered to let plaintiff keep his old chair. *Id.* Thompson recalled that he tried to coach plaintiff on "how to effectively elevate issues," but that plaintiff said he was going to talk to human resources about his concerns about what Thompson had said. *Id.*

After this conversation plaintiff filed an internal complaint against Campbell and Thompson, alleging that they had engaged in threatening and harassing verbal conduct. Doc. 1, ¶ 15. Plaintiff then interviewed for the supervisor position on October 4, 2018, with a team including Campbell, Thompson, two human resources representatives, and two other superintendents in similar positions to Campbell. Doc. 17, att. 2, ¶ 6. At the time plaintiff was sixty-one years old. Doc. 29, p. 18; *see, e.g.*, doc. 29, att. 10, p. 1.

The team concluded that plaintiff had not interviewed well, with team members recalling that plaintiff provided vague and non-specific answers, offered limited details, and failed to show leadership through the examples he chose.  Doc. 17, att. 2, ¶¶ 6–7; *see* doc. 17, atts. 6–11 (declarations of other interview team members). Thompson testified that the interviewers used the "Interview Guide for General Professionals" in their interviews for the electrical maintenance supervisor position. Doc. 29, att. 3, pp. 38–39. The guides from plaintiff's interview were produced in discovery and show notes by the respective interviewers along with individual ratings between 2 and 3 out of 10 in the relevant domains. Doc. 29, att. 25. The scoring sheets support the interviewers' declarations, with

interviewers' notes indicating that plaintiff's examples were too general and that he failed to explain them. *Id.* at 8–9, 20–21, 32–33, 44, 47, 56, 68. Plaintiff was not offered the promotion and only one of the three positions was filled by an internal candidate—Chris Bellon, a 34-year-old white male. Doc. 17, att. 2, ¶¶ 7–8. The other two positions were offered to external applicants John Frank (African-American, 47 years old) and Josh Vernier (white, 39 years old). *Id.* at ¶ 9. Frank turned down the position and it was instead filled by Joseph Holcombe (white, 32 years old).[1] *Id.*

On November 14, 2018, Campbell assigned plaintiff and one other electrician to a temporary move to Plant C to assist with a significant unplanned outage. Doc. 17, att. 4, ¶¶ 6, 9; doc. 17, att. 2, ¶ 11. Plaintiff complained to human resources regarding the move and then took vacation from November 27 through December 3, 2018. Doc. 17, att. 4, ¶ 6; doc. 17, att. 1, pp. 103–05. On the day of his return, December 4, HR manager Barbara Downer met with plaintiff regarding his complaints about supervisors and the transfer. Doc. 17, att. 3, ¶ 12. According to Downer's affidavit, she shared that the company takes complaints very seriously and that his had been investigated, leading to opportunities to coach his supervisors. *Id.* Concerning the transfer to Plant C, however, she stated that the company had the right to move its workforce in response to business needs. *Id.*

Later that day, plaintiff alleged that he was unraveling a solder wire at his work station when he noticed that someone had tied a "noose" at the end of it. Doc. 1, ¶ 20. In

---

[1] Plaintiff asserts that Westlake only offered the position to Frank, knowing he had already accepted another position and would not take it. Doc. 29, pp. 19–20. While Frank's application record shows that he had accepted another job, there is nothing to support plaintiff's contention that Westlake knew of this fact when it made the offer. *See* doc. 29, att. 6, pp. 62–65.

response the union president and two security officials came to document the event and take the noose to human resources. *Id.* After meeting with different Westlake officials over the next several days, who assured him they were investigating the incident, plaintiff filed a complaint with the Calcasieu Parish Sheriff's Office on December 12, 2018. *Id.* at ¶¶ 21–24. On December 14, 2018, plaintiff filed a grievance through the union relating to his temporary transfer to Plant C. Doc. 17, att. 3, ¶ 13. The company determined that the transfer was legitimate and likewise moot because plaintiff had already returned to his regular assignment. *Id.*; doc. 17, att. 4, ¶ 9. The union then withdrew the grievance. Doc. 17, att. 3, ¶ 13.

Meanwhile, Westlake human resources staff investigated the noose incident through December 2018 and January 2019. Managers Barbara Downer and Melissa Padgett interviewed everyone with access to the work area but were unable to find anyone who noticed something new or noteworthy. Doc. 17, att. 3, ¶ 14; doc. 17, att. 4, ¶ 10. Human resources director John Boulanger, who was based out of Houston, also kept in touch with plaintiff about the status of the investigation via phone. Doc. 17, att. 5, ¶¶ 2–3. At the conclusion of the investigation he traveled to plaintiff's work site and met with him, recalling the meeting as follows:

> When Lemonia and I met on January 29, 2019, Lemonia thanked me for meeting with him. I noted that a majority of Lemonia's concerns could and should be handled through the CBA's grievance process. I also specifically addressed the Company's position in regarding Lemonia's 2018 application for a supervisor position. Regarding the spool of wire, I told Lemonia that based on my own prior experience, the end of the spool of wire appeared to me how I would have safely secured the end of the wire. Nevertheless, I told Lemonia that the Company thoroughly investigated the issue, Westlake was unable to identify the person who left the spool on

Lemonia's workstation, and was concluding the matter. I also confirmed with Lemonia that no other incidents had occurred, and Lemonia verified that fact. I also told Lemonia that Lemonia could call me on my cell if Lemonia had any new information to share.

*Id.* at ¶ 6.

Around the same time, Thompson began preparing for annual reviews of the employees in his unit. He instructed Campbell to seek input from the internal constituents who worked directly with those employees in order to get feedback on their performance. Doc. 17, att. 2, ¶ 12. Regarding plaintiff, Campbell reportedly received "quite a bit of negative feedback" including complaints about the amount of time he took to complete work, his unwillingness to assist others, his unnecessary escalation of issues to the company's safety department and stopped jobs for issues he could have safely resolved himself, his failure to complete tasks, and his habit of spending too much time visiting with others. *Id.* Based on this feedback, plaintiff received an "unsatisfactory" overall evaluation for 2018 and was placed on an improvement plan at a meeting in February 2019.[2] *Id.* at ¶ 13; doc. 17, att. 1, p. 171. Plaintiff and the union filed a grievance over the review, but the union withdrew the grievance in May 2019. Doc. 17, att. 1, pp. 170–71; doc. 17, att. 3, ¶ 15. Plaintiff then filed a charge of discrimination with the EEOC in June 2019, complaining of retaliation as well as discrimination based on his race and age. Doc. 29, att. 70.

Campbell passed away in July 2019, and Keith Willis took over as superintendent. During plaintiff's next improvement plan meeting, on July 25, 2019, Willis told him not to

---

[2] Plaintiff has produced performance reviews from 2015–2017 and 2008–10 showing that he received mostly satisfactory, and a few commendable, ratings in those years. Doc. 29, att. 49.

talk to anyone about anything except work unless he was on a break or lunch period. Doc. 29, att. 2, pp. 209–10. After this meeting plaintiff began to feel dizzy and went to the onsite medical building. *Id.* at 211–12. Based on this incident he was later diagnosed with situational anxiety and a panic attack. Doc. 29, att. 57. From that time until October 29, he went on an extended paid medical leave. Doc. 17, att. 3, ¶ 17; doc. 29, att. 2, p. 213.

After his return plaintiff was required to complete certain computer-based training modules ("CBTs"), including ones regarding an updated code of conduct. Doc. 17, att. 3, ¶ 22. He met with Barbara Downer on November 15, 2019, and raised issues with respect to the code of conduct and other training areas reflected in the CBTs.  *Id.* at ¶ 23. Plaintiff signed the code of conduct acknowledgment "under duress." Doc. 29, att. 2, p. 219. He then returned to medical leave on November 18, 2019, and Westlake approved his requests to continue that leave through January 2021. Doc. 17, att. 3, ¶ 24. Plaintiff remained out on medical leave until he resigned from Westlake in November 2020 and began receiving retirement benefits. Doc. 29, att. 2, p. 301.

The EEOC dismissed plaintiff's 2019 charge and issued a notice of suit rights on September 9, 2020. Doc. 1, att. 1. Plaintiff then filed suit in this court on December 8, 2020, raising claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; and 42 U.S.C. § 1981. Specifically, he alleges that Westlake violated these laws by (1) subjecting him to a hostile work environment due to his race, (2) failing to promote him to supervisor based on both his race and age; and (3) failing to promote him and otherwise retaliating against him because of his prior complaints. Doc. 1.

Westlake now moves for summary judgment, asserting that plaintiff cannot make out a prima facie case on any of his claims.

## II.
### SUMMARY JUDGMENT STANDARD

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). He may meet his burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The non-moving party is then required to go beyond the pleadings and show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To this end he must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material

fact exists if a reasonable trier of fact could render a verdict for the nonmoving party.

*Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## III.
## LAW & APPLICATION

### A. Hostile Work Environment

Plaintiff has alleged that he was exposed to a hostile work environment on account

of his race, in violation of Title VII of the Civil Rights Act and 42 U.S.C. § 1981.[3] To

establish a prima facie case of a hostile work environment, a plaintiff must show the

following: (1) he belongs to a protected group, (2) he was subject to unwelcome

harassment, (3) the complained-of harassment was due to his membership in a protected

group (e.g., due to his race), (4) the harassment complained of affected a term, condition,

or privilege of his employment, and (5) the employer knew or should have known of the

harassment but failed to take prompt remedial action. *Mendoza v. Helicopter*, 548 F. App'x

127, 128–29 (5th Cir. 2013) (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir.

2002)).

Plaintiff's hostile work environment claim centers on the noose incident.[4] Westlake

moves for summary judgment based on his inability to meet his burden on the fourth or

---

[3] Claims of race discrimination and retaliation under 42 U.S.C. § 1981, which protects the right to make and enforce contracts, are analyzed under the same standards as those raised under Title VII of the Civil Rights Act. *Johnson v. Halstead*, 916 F.3d 410, 420 (5th Cir. 2019).

[4] In the complaint plaintiff alleges that the harassment consisted of both the failure to promote as well as the noose incident. Doc. 1, ¶ 48. As Westlake notes, however, failure to promote already serves as the basis for his other ADEA/Title VII claims. Other federal courts have observed that "allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim" poses apparent danger, including "significantly blur[ring] the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address." *Robinson v. Paulson*, 2008 WL 4692392, at *20 (S.D. Tex. Oct. 22, 2008) (quoting *Parker v. State, Dep't of Pub. Safety*, 11 F.Supp.2d 467, 475 (D. Del. 1998)). The undersigned agrees, and at any rate plaintiff only defends the claim in his opposition based on the noose incident.

fifth elements. On the severity element, an employer violates Title VII "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). Because Title VII is "only meant to bar conduct that is so severe [or] pervasive that it destroys a protected class member's opportunity to succeed in the workplace," courts have set a high standard for determining what constitutes a hostile work environment. *Lewis v. M7 Prods., LLC*, 427 F.Supp.3d 705, 720 (M.D. La. 2019) (internal quotation omitted). The conduct must be both subjectively and objectively offensive, meaning that the victim perceived the environment as hostile or abusive and that a reasonable person would do likewise. *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007). Courts examine such a claim based on the totality of the circumstances, looking to the frequency and severity of the conduct, whether it was physically threatening or humiliating, and whether it "unreasonably [interfered] with an employee's work performance." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347 (5th Cir. 2007). "No single factor is determinative." *WC&M Enters., Inc.*, 496 F.3d at 399. "[I]solated incidents, **if egregious**, can alter the terms and conditions of employment." *Harvill v. Westward Comms., LLC*, 433 F.3d 428, 434 (5th Cir. 2005) (emphasis added).

"District courts in the Fifth Circuit, while treating a noose in the workplace as a severe and troubling matter, have found that a single, isolated incident is not severe or pervasive enough to alter the conditions of employment and thereby create a working environment so abusive that an actionable hostile work environment claim can be found

under Title VII." *Morris v. Pellerin Milnor Corp.*, 2018 WL 1726257, at *9 (E.D. La. Apr. 10, 2018); *accord Davis v. Ochsner Med. Ctr.*, 2016 WL 1383638, at *3–*4 (E.D. La. Apr. 7, 2016); *see also Brooks v. Firestone Polymers, LLC*, 70 F.Supp.3d 816, 821 (E.D. Tex. 2014) (collecting cases); *cf. Berry v. Texas Women's Univ.*, 528 F.Supp.3d 579, 610 (E.D. Tex. 2021) (distinguishing a case where noose remained on display and plaintiff's supervisor joked about it). While other cases have also emphasized the plaintiff's failure to complain, "the single appearance of what appeared to plaintiff to be a noose . . . without any previous or subsequent instances of overtly racial harassment or discrimination, falls far short of establishing an actionable hostile work environment claim[.]" *Morris*, 2018 WL 1726257 at *10. Accordingly, plaintiff cannot meet the fourth element of his claim and Westlake is entitled to summary judgment.

## B.  Failure to Promote – Discrimination

Plaintiff next claims that Westlake violated Title VII, the ADEA, and 42 U.S.C. § 1981 by failing to promote him to supervisor in 2018. As noted supra, note 1, plaintiff's § 1981 claims are analyzed under the same standard as his Title VII claims. His Title VII and ADEA discrimination claims are likewise analyzed under the same standards. *E.g.*, *Kebiro v. Wal-Mart Stores, Inc.*, 568 F.Supp.2d 747, 752 (E.D. Tex. 2005).

To establish a prima facie case of discrimination based on a failure to promote, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the promotion sought; (3) he did not receive the promotion; and (4) his employer either left the position open or filled it with a person outside plaintiff's protected class(es). *Kebiro*, 568 F.Supp.2d at 753 (citing *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 680–81 (5th Cir.

2001)). If the plaintiff succeeds, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. The employer's burden is one of production rather than persuasion and does not involve a credibility assessment. *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2011). If it meets this requirement, the burden shifts back to the plaintiff to show that either (1) the employer's proffered explanation is not true and is instead a pretext for discrimination or (2) the employer's reason, while true, is not the only reason for its action and another "motivating factor" is plaintiff's protected characteristic. *Id.* Accordingly, the plaintiff bears the ultimate burden of persuading the trier of fact that he was the victim of illegal discrimination. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001).

Westlake moves for summary judgment on the grounds that (1) plaintiff cannot prove his prima facie case because one of the supervisor positions was offered to someone in both of his protected classes; (2) Westlake had a legitimate, non-discriminatory reason for its actions based on plaintiff's interview performance and plaintiff cannot show pretext; and (3) plaintiff's § 1981 claim is time-barred.

On the first basis, Westlake has shown that one of the three supervisor positions was offered to John Frank, a 47-year-old African-American man. By its terms, the ADEA applies only to "individuals of at least 40 years of age." 28 U.S.C. § 631. Accordingly, Westlake maintains that plaintiff cannot meet the third element of his prima facie case. But *McDonnell Douglas* only requires that the position be **filled** by someone from outside the protected class(es). Westlake fails to point to any case law showing that this element is defeated if the position is offered to, but not accepted by, someone within the protected

class(es). Instead, this evidence should be considered in determining whether plaintiff can establish pretext.

On the second basis, Westlake relies on plaintiff's scoring by the interview committee. "An employer's subjective reasons for not [promoting] a candidate, such as a subjective assessment of the candidate's performance in an interview, may serve as a legitimate, non-discriminatory reason for the candidate's non-selection" as long as the employer "articulates a clear and reasonably specific basis for its subjective assessment." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 616 (5th Cir. 2007). Accordingly, the Fifth Circuit has found that the employer's burden is not met when it fails to provide some indication of the factual basis or specific reasons behind plaintiff's interview score. *Joseph v. City of Dallas*, 277 F. App'x 436, 440 (5th Cir. 2008) (citing *Alvarado*, 492 F.3d at 616)).

The Fifth Circuit found that an employer had not met its burden in *Alvarado*, when it provided the scores from plaintiff's interview but "offered neither an explanation nor evidence of how or why the interviewers arrived at those scores" or why other candidates were rated higher than plaintiff. *Id.* at 616. However, the same court rejected an argument that defendant did not supply a sufficiently specific reason in *Joseph*, supra, 277 F. App'x at 441. In the latter case, defendant provided interview forms and affidavits explaining plaintiff's low scores and the court distinguished the matter from cases *Alvarado*, "where the defendant relies on nothing more than an unexplained interview score that might be consistent with discriminatory intent." *Id.*

Here Westlake has provided interview guides and score sheets containing notes on plaintiff's specific low rankings. It has also provided declarations from the interviewers,

some of whom recall particular reasons for their low ratings and all of whom recall negative impressions of plaintiff during his interview. The fact that Westlake has not provided score sheets from other interviewees will not prevent it from meeting its burden; as in *Joseph* and other cases, evidence of the interviewers' negative impressions as to this applicant are enough. *See also Hollaway v. Woodlet*, 203 F. App'x 563, 566 (5th Cir. 2006) (defendant met its burden with testimony from interviewers on plaintiff's demeanor during interview); *Todd v. Natchez-Adams Sch. Dist.*, 160 F. App'x 377, 379 (5th Cir. 2005) (defendant met its burden through testimony from interviewers that plaintiff did not answer questions precisely and score sheets with comments showing her answers were too lengthy). Westlake has thus met its burden of production by producing depositions from the interview team members, who recall that plaintiff provided vague and non-specific answers, offered limited details, and failed to show leadership through the examples he chose, and interview score sheets with low scores and notes explaining same. Accordingly, the burden shifts to plaintiff to show pretext.

In order to demonstrate pretext, the plaintiff must demonstrate that discrimination "lay at the heart of the employer's decision." *Price v. FedEx Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). This showing may take multiple forms, including offering evidence from which a reasonable factfinder could conclude that the employer's justification is false. *Pratt v. City of Houston, Tex.*, 247 F.3d 601, 606–07 (5th Cir. 2001). While a plaintiff may sometimes prevail with a prima facie case and sufficient evidence to reject the employer's explanation, the employer is still entitled to summary judgment if the plaintiff can create only a weak issue of fact as to whether the employer's explanation is true and there is

"abundant and uncontroverted independent evidence that no discrimination occurred." *Id.* Accordingly, whether summary judgment is appropriate "depends on a variety of factors, including 'the strength of the prima facie case, the probative value of the proof that the employer's explanation is false and any other evidence that supports the employer's case and may properly be considered.'" *Id.* (quoting *Reeves*, 530 U.S. at 148–49).

Plaintiff notes his testimony of his own belief that the interview went well.[5] Doc. 29, att. 2, pp. 95–96. This subjective and self-serving testimony is irrelevant in light of evidence showing that the interview was poorly rated and made an unfavorable impression on the panel members who could recall it. Plaintiff also points to testimony that the panel members sometimes only rated candidates after a roundtable discussion. *E.g.*, doc. 29, att. 3, p. 69; doc. 29, att. 4, pp. 27–44. Accordingly, he alleges that the interview ratings were tainted by statements and opinions from other members of the panel. Given the lack of any evidence of discriminatory intent by other panel members, however, this is insufficient to show bias on the part of the committee.

Finally, plaintiff points out that the panel interviewed three internal candidates for the position—himself, Herb Stephens (also African-American), and Chris Bellon (white). Doc. 29, att. 3, pp. 38–39. Thompson acknowledged that the facility had an informal preference for internal candidates. *Id.* at 38. However, only Bellon was offered one of the supervisor positions. *Id.* at 41. Thompson did not appear to recall any specifics about Stephens's interview, but stated:

---

[5] He also points to Thompson's testimony recalling his and Campbell's negative impressions of plaintiff. Doc. 29, att. 3, pp. 121, 128. This testimony, however, does not show any animus based on race or age.

> We went through the interview process. We asked questions on the interview guide and we evaluated the answers and the responses, and based on those responses and the ratings that we gave, we were in agreement that—that he was not someone we wanted to make an offer to.

*Id.* at 42. He admitted, however, that both Stephens and plaintiff met the "bare minimum qualifications to be considered for the post." *Id.* at 72. The interview guide/score sheet for Stephens was never produced, despite testimony from HR associate Kysha Martin that the guides are typically stored in an on-site filing cabinet by the HR representative present during the interview. Doc. 29, att. 6, p. 31. However, plaintiff has not brought a spoliation claim relating to these interview guides and fails to even show that he previously requested them. He has also failed to produce any other evidence of Stephens's training or experience. Meanwhile, plaintiff admitted that Bellon had received more on-the-job training for the supervisor position than he (plaintiff) had by virtue of his experience as a leadman. Doc. 29, att. 2, pp. 98–99, 189–90. He also admitted that he had had the opportunity to earn this same experience. *Id.* at 207–08.

Plaintiff has failed to show that the interview process and the ratings of the members were tainted by any discriminatory animus, or to rebut the objective evidence that he did not interview well. He has also admitted that, despite the company's informal preference for promoting internal candidates, the white internal candidate who was selected had more experience for the position. As noted above, one of the external candidates who was offered the position was African-American. Plaintiff has not shown that any of the external candidates was less qualified than he was. In light of this evidence, the mere fact that one other African-American candidate was not selected, despite having "bare minimum"

qualifications, is not enough for a reasonable factfinder to find discriminatory motive on the part of the defendant. Accordingly, the discrimination claims based on failure to promote must be dismissed and the court need not decide whether the failure to promote claim under § 1981 is likewise time-barred.[6]

## C. Retaliation

Plaintiff also claims that Westlake violated Title VII, the ADEA, and 42 U.S.C. § 1981 by retaliating against him for his 2017 EEOC charge, his internal complaint about the noose incident, his 2018 union grievance regarding the temporary transfer, and his 2019 charge of discrimination with the EEOC. As acts of retaliation he points to the following: (1) the promotion denial in fall 2018, (2) his temporary transfer in November 2018, (3) his unsatisfactory performance review and resulting improvement plan in February 2019, and (4) his verbal reprimand by Willis, culminating in his constructive discharge.[7] Doc. 1, ¶¶ 69–85. In his opposition to the motion for summary judgment he also asserts that he was subjected to a retaliatory hostile work environment. Doc. 29, pp. 62–66.

To establish a prima facie case of retaliation, a plaintiff must show that (1) he participated in an activity protected under Title VII; (2) his employer took an adverse

---

[6] A four-year limitations period applies to § 1981 claims that were not available prior to the 1991 amendments, while Louisiana's one-year prescriptive period applies to claims available before that time. *E.g.*, *Hill v. Cleco Corp.*, 541 F. App'x 343, 345 (5th Cir. 2013). Failure to promote claims were actionable prior to the 1991 amendments only if "the nature of the change in position was such that involved the opportunity to enter into a new contract with the employer." *Brooks v. Firestone Polymers, LLC*, 70 F.Supp.3d 816, 852 (E.D. Tex. 2014). Accordingly, the court must compare the duties, salary, and benefits between the two positions to determine if "substantial changes" are involved. *Id.* (quoting *Fonteneaux v. Shell Oil Co.*, 289 F. App'x 695, 699 (5th Cir. 2008)). Neither party has produced sufficient evidence to guide this inquiry.

[7] In his opposition to this motion, plaintiff also asserts that Westlake retaliated against him by failing to adequately investigate the noose incident and by generally subjecting him to a hostile work environment. Doc. 29, p. 50. This is not named as an incident of retaliation in the complaint, and the court will instead consider it under the plaintiff's putative claim of retaliatory hostile work environment, *infra*.

employment action against him; and (3) a causal link exists between the protected activity and the adverse action. *Feist v. Louisiana*, 730 F.3d 450, 454 (5th Cir. 2013). The causal connection must be "but for," meaning that the adverse action would not have occurred without the protected activity. *Univ. of Tex. SW Med. Ctr. v. Nassar*, 570 U.S. 338, 360–61 (2013). If he makes this showing, the burden shifts as above to the employer to articulate a legitimate, non-discriminatory reason for its decision and then to the plaintiff to show that this reason is actually a pretext retaliation. *Septimus v. Univ. of Houston*, 399 F.3d 601, 610–11 (5th Cir. 2005). Westlake moves for summary judgment on each alleged incident of retaliation.

### 1.  Failure to promote and temporary transfer

Plaintiff first attempts to show retaliation based on his denial of promotion to supervisor in October 2018 and temporary transfer to Plant C in November 2018. The relevant protected activity is his May 2017 EEOC charge about transfer of African-American electricians to Plant B and his complaint to HR in October 2018 about yelling and threats by Thompson and Campbell. Westlake maintains that plaintiff cannot establish a causal nexus between the EEOC charge and the promotion, since the charge was dismissed more than one year before plaintiff even applied for the promotion. It also asserts that plaintiff's 2018 complaints to HR were not protected activity. These arguments inure to the benefit of the other alleged retaliation incident, which came shortly thereafter and before any other alleged protected activity.

On the first issue, temporal proximity alone may support a causal link but only when the protected activity and adverse employment decision are sufficiently close—meaning a

matter of months apart. *E.g.*, *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471–72 (5th Cir. 2002) (finding that five months between protected activity and adverse action, standing alone, was insufficient to support an inference of retaliation). The EEOC charge was filed and dismissed over one year before plaintiff even applied for the promotion or before his temporary transfer. Plaintiff has submitted no competent evidence to show that Thompson, Campbell, or any other decision-maker on his application for the supervisor position knew of the charge.[8] Accordingly, he cannot establish a causal nexus between the two events and the claim must be dismissed in this regard.

As for the HR complaint, plaintiff applied for the promotion in August 2018. In September 2018 he complained to Campbell about chairs in the breakroom, then complained to Thompson about the way Campbell had spoken to him. On October 2, 2018, two days before his interview, he met with HR manager Barbara Downer to complain about alleged yelling and cursing from Campbell and alleged threats from Thompson about escalating issues and filing frivolous reports. In his deposition plaintiff did not attribute either of these events to discrimination based on his race or age. *See* doc. 29, att. 2, pp. 88–93. There is likewise no indication in Downer's declaration that Thompson complained at this point about discrimination. Doc. 17, att. 3, ¶ 12. The only reference to race issues

---

[8] In his deposition Thompson acknowledged that plaintiff had a reputation for "escalat[ing] things[,] going around the supervisor." Doc. 29, att. 3, p. 121. However, he never testified as to any awareness of the 2017 EEOC charge and only indicated awareness of plaintiff not going through the proper channels within the company. *See id.* at 123–24. Plaintiff stated in his deposition that "someone" told him Campbell knew about the 2017 EEOC charge, but he could not identify this person. Doc. 29, att. 2, p. 262. Plaintiff further admitted that he was unsure whether Thompson knew of the charge. *Id.* at 262–63. The Fifth Circuit has rejected such unsourced workplace rumors as a basis for establishing a causal nexus. *See Gibson v. Verizon Servs. Org., Inc.*, 498 F. App'x 391, 397 (5th Cir. 2012).

comes from a September 2018 email from Thompson, summarizing his discussion with

plaintiff to HR representative Melissa Portie:

> Glenn came to me with a complaint about the new chairs that had been purchased for the Plant B Electrical lunch room/shop stating that the lumbar part of the chair hurt his back.  He has had kidney stones in the past and he felt this is the cause of his back hurting when sitting in these chairs.  He stated that Leon would not purchase him a new chair and would not allow him to use the old chair that he had been sitting in.  He stated that when he questioned Leon about it, Leon "hollered" at him in the shop and told him he wasn't getting new chairs and that he should go to medical if he had a problem.  Glenn produced a letter from Medical that said he should either try a different chair or bring a pillow/cushion to sit on.  Glenn said he wanted a different chair, but the main reason he came and spoke to me was because of Leon's response in which he raised his voice and was disrespectful to Glenn.
>
> The chairs that were purchased were part of a new electrical lunch/shop that was built recently.  The chairs are Serta leather 5-legged rolling office chairs that are listed as ergonomic.  I am told that one other electrician (Jamie Smith) complained that they were not comfortable.  These chairs are only used during breaks, lunch and meetings.
>
> I took the opportunity to advise Glenn that he had been known to elevate issues in the past that could be considered minor, and that this can cause people to not take him seriously.  He asked for an example, and I mentioned the issue he had a few months ago regarding not getting a lunch following the EDC TAR when others had been provided lunches.  At that time, Glenn had requested a meeting with Pat Goree about it, but I understand the meeting did not occur.  Glenn then listed some concerns he had brought up in the past concerning racial slurs and personnel moves that he believed to be racially-biased.  He also brought up a particular safety issue regarding people not wearing hardhats that he had raised in the past.  I stressed to Glenn that any racial slur or related concern he has should be raised in the future and any verified occurrence of such would not be tolerated by me or Westlake.  I also stressed to Glenn that he should always raise any safety concern.  I made sure he understood that my comment to him was not about issues like those, but other issues like the lunches so that he maintains his credibility and people don't overlook his concerns as a result.
>
> I informed Glenn that I would have a conversation with Leon about his concerns and provide feedback.
>
> I met with Leon shortly after this meeting and discussed the concerns.  Leon informed me that he had spoken to Jamie Smith in the shop about the chairs and let him know that he did not intend to purchase new chairs for him and Glenn because he felt the chairs were over and above what was required and if he bought them chairs he may as well buy new ones for everyone.  He told Jamie that if they went to Medical and got a requirement back from them that he would follow their requirements.  Glenn was not in the room at this time, according to Leon.  Jamie later spoke to Glenn about it and let him know what Leon had said.  Glenn later talked to Leon about it and told Leon he was going to Medical and also wanted to meet with me.  Leon stated that he had never raised his voice to Glenn, nor did he tell Glenn he could not use his old chair.  Leon offered to talk to Glenn and let him know that he did not recall raising his voice, but if Glenn perceived it that way, he apologizes for it.  He will also let him know that he can use his old chair if he wants.

Doc. 29, att. 22, p. 2.

For purposes of a retaliation claim, a plaintiff must show that he has (1) opposed an

unlawful employment practice or (2) made a charge, testified, assisted, or participated in

any manner in a Title VII or ADEA investigation, proceeding, or hearing. *Grimes v. Tex.*

*Dep't of Mental Health*, 102 F.3d 137, 140 (5th Cir. 1996); *Holt v. JTM Indus., Inc.*, 89

F.3d 1224, 1226 (5th Cir. 1996). The prohibition on retaliation "protects employees who use informal methods to voice their complaints, as well as those who file formal charges." *Alack v. Beau Rivage Resorts, Inc.*, 286 F.Supp.2d 771, 774 (S.D. Miss. 2003). Additionally, the opposed practices need not be illegal under the relevant statutes as long as the employee had a reasonable belief that they were. *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996). Finally, as plaintiff notes, "[m]agic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." *Brown v. UPS, Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010).

Plaintiff asserts that the reference to past complaints about racial slurs in Thompson's email is sufficient to show that he was opposing illegal racial discrimination under Title VII. The context of the email shows, however, that these **past** allegations were discussed in the context of issues appropriately escalated to management, in contrast to plaintiff's complaints about more trivial matters. Accounts from plaintiff himself and HR show that plaintiff was not complaining about race- or age-based discrimination during his meeting with Thompson in September 2018 or his report to HR the following month. Accordingly, plaintiff can show no basis for a reasonable belief that he was opposing a practice made illegal under Title VII or the ADEA in these activities. His prima facie case thus fails as to the promotion denial and temporary transfer, to the extent the latter event would even qualify as an adverse employment decision in the first place.

## 2.  Improvement plan and treatment by Willis

Plaintiff next alleges that he was subject to retaliation through his improvement plan and his treatment by new supervisor Keith Willis, specifically a verbal warning not to socialize with colleagues during work hours. Westlake contends that neither event qualifies as an adverse employment action.

For purposes of a retaliation claim, an adverse employment action "need not rise to the level of ultimate employment decisions." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 827 (5th Cir. 2019). Instead, it is enough that the action is "materially adverse, such that it would dissuade a reasonable employee from making a discrimination complaint." *Newbury v. City of Windcrest, Tex.*, 991 F.3d 672, 678 (5th Cir. 2021). Accordingly, a reprimand may in some circumstances rise to the level of an adverse employment action. *Id.* However, "an employer's decision to place an employee on a performance improvement plan is not an adverse employment action." *Welsh*, 941 F.3d at 824 (citing *Turner v. Novartis Pharma. Corp.*, 442 F. App'x 139, 141 (5th Cir. 2011)). Accordingly, even though plaintiff has produced records of satisfactory performance reviews in some of his prior years at Westlake, this incident cannot support a claim of retaliation.

As for Willis's reprimand, plaintiff cites only a verbal instruction that he—and he alone—should refrain from talking to other employees except when on breaks. Plaintiff complains that Willis's intent was to isolate him and that this instruction was the "straw that broke the camel's back," leading to a panic attack and ongoing medical issues. Doc. 29, pp. 60–61. Even with this context and plaintiff's subjective factors, however, the court

cannot find that the instruction was sufficient to dissuade a **reasonable** employee from making a discrimination complaint. Willis's instruction was not accompanied by any overt threats and specifically excluded break time and the lunch period; plaintiff was free to talk to his colleagues about work issues during work hours and to otherwise socialize with them during rest periods. Furthermore, Willis stated in his declaration that he had received feedback that plaintiff "was not getting jobs done because he was socializing and not working," and that his instruction was intended to address the issue. Doc. 17, att. 9, ¶¶ 3–4. Although plaintiff testified that he took exception to the instruction, he offers no basis for refuting the problem Willis states he was trying to address. The fact that colorable grounds existed for the warning should likewise lead a reasonable employee to understand "that the restrictions were not the offspring of a retaliatory mind-set." *Baloch v. Norton*, 517 F.Supp.2d 345, 355 (D.D.C. 2007) (citing *DeHart v. Baker Hughes Oilfield Ops., Inc.*, 214 F. App'x 437, 442 (5th Cir. 2007)). Finally, the court can locate no caselaw supporting the idea that a single verbal reprimand, even in the context of an improvement plan meeting, would rise to the level of an adverse employment action. *Cf. Thibodeaux-Woody v. Houston Cmty. Coll.*, 593 F. App'x 280, 286 (5th Cir. 2014) ("While a reprimand can serve as the basis for a retaliation claim under certain circumstances, we have held that a written reprimand, without evidence of consequences, does not constitute an adverse employment action.") (internal citations omitted). Accordingly, neither event supports a retaliation claim.

### 3. Retaliatory hostile work environment/constructive discharge

Finally, plaintiff alleges that the retaliation culminated with his constructive discharge on November 30, 2020, after "numerous years" of exposure to an abusive working environment at Westlake. Doc. 1, ¶ 80. Westlake moves for summary judgment on this claim based on plaintiff's failure to show sufficiently severe or pervasive harassment. In his opposition to the motion, plaintiff also asserts that he was subjected to a retaliatory hostile work environment. Doc. 29, pp. 62–66. Westlake objects on the grounds that this claim was not raised in the complaint and the deadline for amending the pleadings has passed. Doc. 35, p. 2 n. 4.

To prevail on a constructive discharge claim, a plaintiff must show that the employer "[made] working conditions so intolerable that a reasonable employee would feel compelled to resign." *Carpenter v. Miss. Valley State Univ.*, 807 F.Supp.2d 570, 596 (N.D. Miss. 2011) (quoting *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 771 (5th Cir. 2001)). Moreover, the plaintiff must demonstrate a "greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment claim." *Woods v. Delta Bev. Group, Inc.*, 274 F.3d 295, 301 (5th Cir. 2001).

Meanwhile, the Fifth Circuit has not yet recognized a cause of action for "retaliatory hostile work environment." *E.g.*, *Tejada v. Travis Ass'n for the Blind*, 617 F. App'x 325, 328 (5th Cir. 2015). Such a claim "results from discrimination that does *not* culminate in a tangible or adverse employment action." *Rowe v. Jewell*, 88 F.Supp.3d 647, 674 (E.D. La. 2015) (emphasis in original). Instead, it involves "a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* "A workplace environment is hostile

when it is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id.* (quoting *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 771 (5th Cir. 2009)).

As Westlake notes, the complaint contains no indication that plaintiff is pursuing a claim for retaliatory hostile work environment. To the extent such a claim exists, however, plaintiff still fails to show sufficiently severe or pervasive treatment. At most, such a claim would add only the alleged inadequacies of HR's investigation into the noose incident to the alleged retaliation incidents (improvement plan and verbal reprimand from Willis) for which plaintiff has been able to establish a causal nexus. The addition of this incident to the others does not rise to the level of actionable retaliation.

On the severity element, an employer violates Title VII "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[9] *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). Because Title VII is "only meant to bar conduct that is so severe [or] pervasive that it destroys a protected class member's opportunity to succeed in the workplace," courts have set a high standard for determining what constitutes a hostile work environment. *Lewis v. M7 Prods., LLC*, 427 F.Supp.3d 705, 720 (M.D. La. 2019) (internal quotation omitted). The conduct must be both subjectively and objectively offensive, meaning that the victim perceived the environment as hostile or abusive and that a reasonable person would do likewise. *E.E.O.C.*

---

[9] Plaintiff also purports to bring this claim under 42 U.S.C. § 1981, but acknowledges that the analysis is the same as under Title VII. Doc. 29, att. 34; *see Puente v. Ridge*, 324 F. App'x 423, 427–28 (5th Cir. 2009).

*v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007). Courts examine such a claim based on the totality of the circumstances, looking to the frequency and severity of the conduct, whether it was physically threatening or humiliating, and whether it "unreasonably [interfered] with an employee's work performance." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347 (5th Cir. 2007). "No single factor is determinative." *WC&M Enters., Inc.*, 496 F.3d at 399.

"Careful monitoring of an employee's job performance does not suffice to support a claim for hostile work environment." *Valdry v. Brennan*, 2017 WL 2702226, at *8 (M.D. La. Jun. 22, 2017) (quoting *Rowe*, 88 F.Supp.3d at 675) (cleaned up). As for the investigation, plaintiff complains that HR manager Barbara Downer did not conduct it herself but rather supervised two other HR employees in the process. He also asserts, without any support, that "HR did not actually see the investigation through any meaningful completion – despite the myriad of cameras and other security measures commonsensically employed through Defendant's facility, the fact that HR was 'unable' to even determine the perpetrator is fatal to Defendant's position regarding its remedial efforts." Doc. 29, p. 53. Finally, he complains that HR considered the possibility (but did not ultimately conclude) that the wire might not have been tied in a deliberately discriminatory manner. However, he fails to point to the existence of any tapes that might have shown the relevant area or to show that HR's procedures regarding this investigation violated any relevant standards.

Though plaintiff may have perceived an accumulation of slights leading to his health difficulties and medical leave, his subjective impressions alone are not enough to prove his

claim. Objectively, this incident even in connection with the other incidents sharing a possible nexus with plaintiff's protected activity under Title VII and the ADEA does not rise to the level of a hostile and abusive environment. Accordingly, plaintiff fails to state a prima facie case of retaliatory hostile work environment. For the same reasons, these incidents fall short of what is required to meet the higher threshold of a constructive discharge claim.

### IV.
#### CONCLUSION

For the reasons stated above, the Motion for Summary Judgment [doc. 17] will be **GRANTED** and plaintiff's claims will be **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED** in Chambers on the 19th day of September, 2022.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**