# United States Court of Appeals
**FIFTH CIRCUIT**
OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
Suite 115
**NEW ORLEANS, LA 70130**

November 09, 2023

Mr. Tony R. Moore
Western District of Louisiana, Lake Charles
United States District Court
300 Fannin Street
Suite 1167
Shreveport, LA 71101-0000

    No. 22-30630   Lemonia v. Westlake Management
                      USDC No. 2:20-CV-1593

Dear Mr. Moore,

Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion.

                       Sincerely,

                       LYLE W. CAYCE, Clerk

                       By: _____
                       Allison G. Lopez, Deputy Clerk
                       504-310-7702

cc:  Ms. Jennifer Lynn Anderson
     Mr. Arthur Edward Hardin Jr.
     Ms. Kourtney Lanea Kech
     Ms. Emily Olivier Kesler
     Ms. Dara Swartz Smith
     Mr. James Edward Sudduth III

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
October 18, 2023
Lyle W. Cayce
Clerk

No. 22-30630

───────────────

GLENN M. LEMONIA,

*Plaintiff—Appellant*,

*versus*

WESTLAKE MANAGEMENT SERVICES, INCORPORATED,

*Defendant—Appellee*.

───────────────

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:20-CV-1593

───────────────

Before DUNCAN and WILSON, *Circuit Judges*, and MAZZANT, *District Judge*.[*]

J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.

───────────────

[*] District Judge of the Eastern District of Texas, sitting by designation.



Certified as a true copy and issued
as the mandate on Nov 09, 2023

Attest: *Lyle W. Cayce*
Clerk, U.S. Court of Appeals, Fifth Circuit

IT IS FURTHER ORDERED that plaintiff-appellant pay to defendant-appellee the costs on appeal to be taxed by the Clerk of this Court.

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
October 18, 2023
Lyle W. Cayce
Clerk

_____

No. 22-30630
_____

Glenn M. Lemonia,

*Plaintiff—Appellant*,

*versus*

Westlake Management Services, Incorporated,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:20-CV-1593

_____

Before Duncan and Wilson, *Circuit Judges*, and Mazzant, *District Judge*.[*]

Per Curiam:[†]

This employment discrimination action arises from a series of events that took place at the facilities of Westlake Management Services (Westlake) from March 2017 to November 2020. Glenn Lemonia, then a Westlake employee, alleges that numerous employment actions were taken against him because of his race, his age, and in retaliation for his protected employment

_____

[*] District Judge of the Eastern District of Texas, sitting by designation.

[†] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

activities. The district court granted Westlake summary judgment on all claims. We affirm.

## I.

### A.

Lemonia began his employment with the company that is now Westlake in 1989. He is an African American man and was over the age of 40 when Westlake allegedly began to discriminate against him. Lemonia was a member of a union, and his employment was subject to a collective bargaining agreement.

In spring 2017, Lemonia's supervisor Leon Campbell, a white man, transferred Lemonia and other electricians from Westlake's Plant A to Plant B. Lemonia resented this transfer and stated, "where they put me was like a sh** job." He was so displeased that he filed a union grievance, alleging that Campbell had moved minority electricians to a less desirable worksite in violation of the collective bargaining agreement. Westlake denied the claim and asserted the transfers were not discriminatory.

Lemonia then filed a Charge of Discrimination with the EEOC in relation to the transfer. He alleged that Campbell violated Title VII by discriminating against him based on his race and for retaliating against him for filing a prior Charge of Discrimination. Ultimately, Lemonia received a Notice of Right to sue letter from the EEOC but did not bring suit.

In August 2018, Lemonia applied for an electrical maintenance supervisor position. The position, one of three openings, would report to Campbell, who in turn reported to Bryan Thompson, the Instrumentation and Electrical Controls Manager, who is also white. Lemonia was interviewed for the position in October 2018 by a team comprised of Campbell, Thompson, and other individuals with ages ranging from 34 to 55.

Case: 22-30630    Document: 00516961758    Page: 6    Date Filed: 11/09/2023
Case 2:22-cv-01593-JDC-KK    Document 105    Filed 11/09/23    Page 6 of 20 PageID #: 2812

No. 22-30630

One of the interviewers was African American. Lemonia received low ratings from each team member—never scoring higher than three out of ten. The interviewers found that he "did not give clear answers" and "went off on tangents with each question." They also concluded that Lemonia could not provide examples of leadership experience or qualities and only gave basic examples of "things a helper would do." He was not selected. The three open positions were filled by white men under the age of 40.

In September 2018, prior to his interview for the supervisor position, Lemonia had several negative interactions at Westlake. First, Lemonia complained about a new chair provided to him in the break room. When Lemonia raised this issue with Campbell, Campbell allegedly "berated, yelled at, and cursed at Lemonia." Lemonia then discussed the chair and Campbell's comments with Thompson. Thompson offered to let Lemonia keep his old chair, and Thompson counseled Lemonia about raising "frivolous" complaints and urged him to try to resolve minor complaints with his supervisors before going to Human Resources (HR). Lemonia then went to multiple HR employees and further complained about his interactions with Campbell and Thompson.

In November 2018, Campbell transferred Lemonia from Plant B to Plant C. The transfer occurred around the same time that Campbell was interviewed by HR about Lemonia's complaints. Thus, Lemonia was dubious about the purported reasons behind his transfer, even though he had previously described his assignment to Plant B as a "sh** job."

Workplace tension continued into December 2018. After a vacation, Lemonia returned to work on December 4 to find "that someone had intentionally tied the end of his solder wire in the shape of a hangman's noose." Lemonia immediately reported the offending wire to his temporary supervisor and a union employee. Westlake security personnel came to

No. 22-30630

investigate the incident and took a picture of the wire. The personnel then took statements from both Lemonia and his temporary supervisor. Lemonia also reported the noose incident as an alleged hate crime to the local sheriff's department. And he filed a formal grievance through his union relating to the transfer to Plant C.

Westlake investigated the noose incident through January 2019, but the company was unable to determine who had left the solder wire at Lemonia's workstation. Westlake's HR director, who was based in Texas, traveled to Louisiana to meet with Lemonia twice in January 2019; Lemonia did not show for their first scheduled meeting. The HR director described the second:

> When Lemonia and I met on January 29, 2019, Lemonia thanked me for meeting with him. I noted that a majority of Lemonia's concerns could and should be handled through the [collective bargaining agreement]'s grievance process. I also specifically addressed the Company's position in regarding Lemonia's 2018 application for a supervisor position. Regarding the spool of wire, I told Lemonia that based on my own prior experience, the end of the spool of wire appeared to me to be how I would have safely secured the end of the wire. Nevertheless, I told Lemonia that the Company thoroughly investigated the issue, Westlake was unable to identify the person who left the spool on Lemonia's workstation, and was concluding the matter. I also confirmed with Lemonia that no other incidents had occurred, and Lemonia verified that fact. I also told Lemonia that Lemonia could call me on my cell if Lemonia had any new information to share.

In February 2019, Lemonia received a negative performance review for the previous year. As a result, he was placed on a six-month Performance Improvement Plan (PIP). Lemonia viewed the PIP as retaliatory and filed

4

No. 22-30630

another union grievance, accusing Campbell and Thompson of engaging in "unlawful activity, discriminatory practices, harassment, and retaliation[.]"

In June 2019, Lemonia filed another Charge of Discrimination with the EEOC. This charge related to the noose incident, his failure to be promoted, and his PIP.

Campbell died on July 4, 2019, and Keith Willis, a white man, replaced Campbell as Lemonia's supervisor. Lemonia had an improvement plan meeting with Willis at the end of July, during which Willis told Lemonia to stop socializing during work and to do so only during breaks or his lunch time. After the improvement plan meeting, Lemonia went to the on-site medical office because he was feeling dizzy. He was later diagnosed with situational anxiety.

Lemonia then took medical leave from July 25 to October 29, 2019. He returned to work at the end of October and attended training regarding whistleblowers. This training caused him to experience shortness of breath and chest pains, and he went back to the on-site medical office. Lemonia then went on medical leave again from November 5 to November 15, 2019. Upon his second return, Westlake asked Lemonia to execute an updated Code of Conduct, which he signed "under duress."

Lemonia then went on medical leave for the third time and never returned to work. According to Lemonia, he continued to experience apprehension and distress over the alleged hate crime he experienced at work. Westlake continued to approve his requests for continued leave until Lemonia resigned in November 2020.

## B.

Lemonia filed suit against Westlake in federal district court in December 2020. He alleged claims under Title VII, the Age Discrimination

in Employment Act, and 42 U.S.C. § 1981. The parties conducted discovery, and Westlake moved for summary judgment.

The district court granted Westlake's motion as to all claims. First, the district court held that the hostile work environment claim could not proceed because it failed on the fourth element—that the harassment complained of did not affect a term, condition, or privilege of his employment. Second, the court dismissed the failure to promote claim because Lemonia failed to demonstrate that the interview process was tainted by discriminatory animus. Third, the district court held that Lemonia's failure-to-promote retaliation claim should be dismissed because his 2017 EEOC charge failed to show a causal nexus, and his 2018 HR complaint about the chair was not a protected activity. Fourth, the district court dismissed Lemonia's retaliation claim based on his performance improvement plan and the verbal warning from Willis not to socialize because they did not rise to the level of adverse employment actions. Finally, the district court held that Lemonia failed to state a prima facie case of retaliatory hostile work environment, which also doomed his constructive discharge claim.

The district court entered judgment in September 2022, and Lemonia timely appealed.

## II.

We review a summary judgment *de novo*, applying the same legal standards as the district court. *Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 255 (5th Cir. 2020). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.'" *Ahders v. SEI Priv. Tr. Co.*, 982 F.3d 312, 315

6

(5th Cir. 2020) (quoting *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)). "We construe all facts and inferences in the light most favorable to the nonmov[ant] . . . ." *Murray v. Earle*, 405 F.3d 278, 284 (5th Cir. 2005). "We may affirm the district court's grant of summary judgment on any ground supported by the record and presented to the district court." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 430 (5th Cir. 2022) (quoting *Amerisure Mut. Ins. Co. v. Arch Specialty Ins. Co.*, 784 F.3d 270, 273 (5th Cir. 2015)).

## III.

### A.

To establish a hostile work environment claim, a plaintiff must prove that he:

> (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

The parties do not contest, and the district court did not address, the first three elements. And because the district court concluded that the noose incident was not, in isolation, sufficiently severe to rise to the level of harassment that affected Lemonia's employment (the fourth element), the court did not reach whether Westlake knew or should have known about it yet failed to take appropriate remedial action (the fifth element). But Lemonia must also satisfy that last element to overcome summary judgment on his hostile work environment claim. *See Williams-Boldware v. Denton*

7

*County*, 741 F.3d 635, 641–42 (5th Cir. 2014); *see also Brooks v. Firestone Polymers, L.L.C*, 640 F. App'x 393, 400 (5th Cir. 2016) (per curiam) (no hostile work environment where Plaintiff "found a miniature hangman's noose placed inside his hard hat at work" because "there [was] no evidence [his employer] knew or should have known about the incident"); *Anderson v. YRC, Inc.*, 742 F. App'x 27, 27–28 (5th Cir. 2018) (per curiam) (no hostile work environment where employer "opened an investigation the day after the . . . noose was reported"); *Tolliver v. YRC, Inc.*, 729 F. App'x 332, 333 (5th Cir. 2018) (per curiam) (same).

Even setting to the side the district court's determination that Lemonia failed to substantiate the fourth element of his claim, the record here easily shows that Westlake promptly took appropriate action, such that this claim fails at the fifth element as well. *See Williams-Boldware*, 741 F.3d at 641. As soon as Lemonia reported the incident, his supervisor contacted Westlake security personnel, who immediately came to Lemonia's worksite and took photos and witness statements. Over the next couple days, Lemonia met with Westlake's HR Director and the plant manager, who both assured him that they were investigating the incident. That investigation continued for two months, as Westlake's HR Department interviewed everyone with access to Lemonia's work area.

Lemonia counters by disputing that Westlake took appropriate actions to remedy the alleged harassment. But in doing so, he only "reincorporates" arguments he made to the district court. This is insufficient to join the issue in this court, and he has accordingly waived his arguments on this point. *See Turner v. Quarterman*, 481 F.3d 292, 295 n.1 (5th Cir. 2007) (declining to consider arguments the plaintiff "incorporate[d] by reference" from his original federal suit).

No. 22-30630

At bottom, Westlake's remedial actions were not deficient simply because Westlake's investigation failed to determine who tied the solder wire and left it at Lemonia's workstation. We affirm summary judgment for Westlake on Lemonia's hostile work environment claim because, regardless of whether the noose incident was itself sufficient to meet the fourth element, Lemonia has likewise failed to establish the fifth element of his claim.[1]

**B.**

Lemonia next contends that the district court erred in dismissing his failure to promote claim. To establish discrimination based on a failure-to-promote theory, Lemonia must show:

> (1) he is a member of a protected class; (2) he sought and was qualified for a position for which applicants were being sought; (3) he was rejected for the position; and (4) the employer either (a) hired a person outside of the plaintiff's protected class, or (b) continued to seek applicants with the plaintiff's qualifications.

*Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 406 (5th Cir. 2021) (citing *McMullin v. Miss. Dep't of Pub. Safety*, 782 F.3d 251, 258 (5th Cir. 2015)). Once Lemonia demonstrates a prima facie case, the burden shifts to Westlake to "articulate a legitimate, non-discriminatory reason for its decision not to promote [Lemonia]," and, if Westlake can meet that burden, Lemonia must

---

[1] Lemonia also asserts that the district court failed to consider his failure to promote claim in conjunction with the noose incident in evaluating his hostile work environment claim. We are dubious that a failure to promote constitutes "harassment" to substantiate such a claim, and in any event, the failure to promote claim fails on other grounds, as discussed *infra*.

9

Case: 23-30533   Document: 00516961758   Page: 11   Date Filed: 11/09/2023
Case 2:22-cv-01593-JDC-KK   Document 46   Filed 04/09/23   Page 13 of 20 PageID #: 2819

No. 22-30630

come forward with evidence that Westlake's reasons for not promoting him are pretext for race-based discrimination. *McMullin*, 782 F.3d at 258.

The district court determined, and we agree, that Lemonia established a prima facie case of discrimination. The only questions we need to consider, therefore, are whether Westlake provided sufficient non-discriminatory reasons for failing to promote Lemonia and whether Lemonia sufficiently demonstrated that those reasons were pretextual. As to the first question, Westlake provided evidence that Lemonia interviewed poorly for the supervisor position. All the interviewers gave Lemonia low ratings. He "did not give clear answers" in his interview "and went off on tangents with each question." And the interviewers concluded that Lemonia could not provide leadership examples and only gave basic examples of "things a helper would do."

Basically, Lemonia had a bad interview, and the panel of interviewers did not score him as the best person for the supervisor position by a clear margin. The detailed interview score sheets, comments, and affidavits from the interviewers were sufficient to meet Westlake's burden to show a non-discriminatory reason for failing to promote Lemonia. *Cf. Alvarado v. Tex. Rangers*, 492 F.3d 605, 617–18 (5th Cir. 2007) (holding employer failed to meet its burden when interview score sheet contained no notes or explanation, and no testimony was provided from interviewers regarding their decision), *abrogated on other grounds by Hamilton v. Dallas County*, 79 F.4th 494, 502–06 (5th Cir. 2023) (en banc).

As to the second question, pretext, Lemonia again failed properly to raise his argument on appeal, merely referencing his briefing at the district court. *See Turner*, 481 F.3d at 295 n.1. In any event, to the extent Lemonia subjectively believed his interview went well or that his lack of promotion was due to racial animus, such a subjective belief offers little probative value. *See*

*Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997) ("To establish pretext, a plaintiff cannot merely rely on his subjective belief that discrimination has occurred . . . ."). The district court thus did not err when it held that Lemonia "failed to show that the interview process and the ratings of the members were tainted by any discriminatory animus, or to rebut the objective evidence that he did not interview well." Westlake, therefore, is correct that Lemonia did not establish a failure-to-promote claim, and summary judgment was proper.

## C.

Lemonia alleges that Westlake also violated Title VII by retaliating against him. Title VII's antiretaliation provision prohibits an employer from discriminating against an employee "because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Saketkoo v. Adm'rs of the Tulane Educ. Fund*, 31 F.4th 990, 999 (5th Cir. 2022) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006)). To establish retaliation a plaintiff must show that (1) he participated in an activity protected by Title VII, (2) he suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action. *Id.* at 1000 (quoting *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020)).

### 1. *Failure to Promote and Temporary Transfer*

Westlake declined to promote Lemonia in the fall of 2018 and then transferred him to a different plant. Lemonia contends these actions were taken in retaliation for his engaging in protected activity. The district court disagreed. On appeal, Lemonia contests the district court's analysis of the allegedly protected activity and the temporal proximity between the

protected activity and the adverse employment actions. But Lemonia has failed to establish this retaliation claim for other reasons.

First, Lemonia has not demonstrated that Westlake discriminated against him when he did not receive the supervisor position. *See supra* Part III.B. Both discrimination and retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Saketkoo*, 31 F.4th at 997–1000. As discussed, Westlake provided sufficient, non-discriminatory reasons for declining to promote Lemonia, and he failed to show pretext. Therefore, Westlake's failure to promote Lemonia cannot form the basis for a discrimination *or* a retaliation claim.

Lemonia likewise cannot succeed on his retaliation claim based on his temporary transfer in November 2019. Relying on the same arguments he utilized for his failure-to-promote claim, Lemonia urges that his temporary transfer from Plant B to Plant C in 2018 was in retaliation for protected conduct under Title VII. But that fails because Lemonia has not demonstrated that the temporary transfer from Plant B to Plant C was an adverse employment action.

Whether asserting a discrimination claim or a retaliation claim, a plaintiff must show that he suffered an "adverse employment action" to state a cognizable claim under Title VII. *See Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 823, 826 (5th Cir. 2019), *abrogated on other grounds by Hamilton*, 79 F.4th at 502–06. "[A] plaintiff seeking to establish a retaliatory adverse employment action 'must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington*, 548 U.S. at 67–68). This requirement is intended to separate "significant from trivial harms." *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008) (quoting

*Burlington*, 548 U.S. at 68). In that vein, Title VII's antiretaliatory provisions "do not protect employees from 'petty slights, minor annoyances, and simple lack of good manners.'" *Welsh*, 941 F.3d at 827 (quoting *Burlington*, 548 U.S. at 67–68).

To determine if an employer's action is materially adverse, the court looks to indicia such as whether the action affected job title, grade, hours, salary, or benefits or caused "a diminution in prestige or change in standing among [] co-workers." *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009). A mere reassignment, standing alone, does not constitute a materially adverse employment action. *See id.* (holding reassignment to a new supervisor with a heavier workload was not a materially adverse employment action); *see also Anthony v. Donahoe*, 460 F. App'x 399, 404 (5th Cir. 2012) (per curiam) (temporary transfer due to emergency circumstances that did not result in change to salary or benefits was not a retaliatory employment action). Whether a reassignment "is materially adverse depends upon the circumstances of the particular case," and the reassignment should be evaluated from the perspective of a reasonable person in the plaintiff's position. *Anthony*, 460 F. App'x at 404 (quoting *Burlington*, 548 U.S. at 71).

With these standards in mind, Lemonia's transfer to Plant C in 2018 did not constitute an adverse employment action. The record indicates that Lemonia was transferred to Plant C due to an emergency outage at the facility, and the move was on a temporary basis to address that issue. There is also no indication that his position at Plant C was less desirable than his previous position at Plant B—especially given that Lemonia complained that he believed his work at *Plant B* was a "s*** job." While Lemonia's duties changed at Plant C because he and other workers had to remedy certain mechanical issues to restore the facility's operations, there is no evidence that others perceived this work in a negative fashion, or even that

13

Lemonia himself believed the nature of his work was unpleasant. *Cf. Burlington*, 548 U.S. at 71 (holding reassignment qualified as adverse decision because previous position had more prestige and new duties were "more arduous and dirtier").

Even drawing all inferences in Lemonia's favor, a reasonable person would not view this temporary, emergency reassignment as dissuading protected activity, especially when the employee's original work assignment may well have been worse. *See Paul v. Elayn Hunt Corr. Ctr.*, 666 F. App'x 342, 347 (5th Cir. 2016) (per curiam); *see also Anthony*, 460 F. App'x at 404. A temporary reassignment, without more, is simply not ground for a Title VII violation. Summary judgment was proper on Lemonia's retaliation claim relating to the Plant C transfer.

### 2. *Performance Improvement Plan*

Lemonia challenges the district court's conclusion that a PIP cannot be an adverse employment action. To an extent, Lemonia's position has merit: We have held that a PIP can support a retaliation claim. *See Ray v. Tandem Computs., Inc.*, 63 F.3d 429, 435–36 (5th Cir. 1995). But a PIP does not constitute an adverse employment action unless it "affect[s] 'job title, grade, hours, salary, or benefits' or cause[s] 'a diminution in prestige or change in standing among . . . coworkers.'" *Welsh*, 941 F.3d at 827 (quoting *Paul*, 666 F. App'x at 346); *cf. Fields v. Bd. of Educ. the City of Chi.*, 928 F.3d 622, 626 (7th Cir. 2019) (stating that negative performance reviews and performance improvement plans do not constitute adverse employment actions); *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 880 n.2 (8th Cir. 2014) (concluding that plaintiff's "placement on [a] PIP alone does not constitute an adverse employment action and cannot support her claim of retaliation").

Here, there is no evidence that Lemonia's placement on a PIP otherwise affected his employment, so it cannot constitute an adverse

employment action in support of his retaliation claim. Lemonia points to *Ray*, 63 F.3d at 435–36, to contend that "[we] ha[ve] found a PIP to be a materially adverse action on which a plaintiff may absolutely base his retaliation claim." But in *Ray* the plaintiff was placed on a PIP *and* her employment was ultimately terminated. *See id.* at 435. In other words, the PIP affected her "job title, grade, hours, salary, or benefits." *Welsh*, 941 F.3d at 827. Accordingly, *Ray* is distinguishable, and the district court did not err to the extent the court concluded that Lemonia's placement on a PIP, without more, did not constitute an adverse employment action.[2]

### 3. *2019 Reprimand*

Lemonia also takes issue with the district court's finding that Willis's verbal reprimand in 2019 did not qualify as an adverse employment action. However, the district court rightfully rejected this argument.

Willis instructed Lemonia to stop socializing with others except when he was on rest periods or during his lunch period. According to Willis, he did this because Lemonia was consistently socializing with workers and not getting his work done. Lemonia asserts this action was in retaliation for his protected activity, but we have clearly held that "verbal reprimands . . . do not constitute actionable adverse employment actions as discrimination or

---

[2] The district court, citing *Welsh*, held that "[a]n employer's decision to place an employee on a performance improvement plan is not an adverse employment action." 941 F.3d at 824. But the district court's analysis was less nuanced and more unequivocal than our precedent allows, as discussed above the line. The part of the *Welsh* opinion cited by the district court was analyzing a discrimination claim, not a retaliation claim. *See id.* And to the extent that the district court categorically held that a PIP cannot be an adverse employment action, that holding conflicts with *Ray*, 63 F.3d at 435–36. Still, the upshot of the court's summary judgment in favor of Westlake on this claim rests on solid footing because in this case, Lemonia fails to show that his PIP affected his employment.

retaliation." *Bye v. MGM Resorts Int'l, Inc.*, 49 F.4th 918, 923 (5th Cir. 2022) (quoting *Welsh*, 941 F.3d at 826). This claim was properly dismissed.

### 4. *Constructive Discharge*

Lemonia submits that the district court wrongly dismissed his claim for retaliatory constructive discharge. Such a theory is actionable when an employee quits his job under circumstances that are treated as an involuntary termination of employment. *Haley v. All. Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004) (citing *Young v. Sw. Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975)). Generally, if an employer deliberately makes an employee's working conditions so intolerable that the employee has no other choice but to resign, then the employer will be liable for any illegal conduct involved therein as if the aggrieved employee had been formally discharged. *Id.* (quoting *Jurgens v. EEOC*, 903 F.2d 386, 390 (5th Cir. 1990)). The test that an employee must satisfy is a stringent one—whether, objectively, a reasonable employee would have felt compelled to resign— that is decided based on several considerations:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer[s] were accepted or not.

*Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338 (5th Cir. 2014) (quoting *Aryain*, 534 F.3d at 481). Furthermore, when evaluating the level of harassment, a theory of constructive discharge requires a greater degree than what is required with a hostile work environment claim. *Newbury v. City of Windcrest*, 991 F.3d 672, 677 (5th Cir. 2021) (quoting *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)).

In this case, Lemonia was not demoted; he did not receive a reduction in his salary; nor was he offered a misleading offer of early retirement at any point. The facts surrounding Lemonia's eventual resignation also favor Westlake. Lemonia was granted medical leave by Westlake for several extended periods before his ultimate decision to resign. Therefore, he was not often physically present at Westlake's facilities in the months leading up to his resignation, making it exceedingly difficult to show that his working conditions were so intolerable that a reasonable employee would feel compelled to resign. *See Perret*, 770 F.3d at 339. Further, as discussed *supra* in Part III.A., Lemonia's hostile work environment claim fails as a matter of law, undermining any constructive discharge claim in the process. *See Newbury*, 991 F.3d at 677.

We agree with the district court that Lemonia did not meet his burden to demonstrate that he was constructively discharged. Summary judgment for Westlake was thus proper as to this claim.

### 5. *Retaliatory Hostile Work Environment*

Lemonia lastly avers that he suffered a "retaliatory hostile work environment." Such a claim has never been recognized by the Fifth Circuit. *See Heath v. Bd. of Supervisors for the S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 741 n.5 (5th Cir. 2017). Against the facts in this case, we decline to entertain such a theory here. The district court correctly dismissed this claim.

### IV.

We agree with the district court that Lemonia's claims fail as a matter of law. Summary disposition was thus appropriate, and the district court's judgment is

AFFIRMED.